Good morning, Your Honors. My name is Frank Say, and I represent Petitioner Jamal Farah. Same country, different applicant. I want to reserve most of my time for a rebuttal, but I want to address a few points. Basically to, number one, introduce, or to set the parameters on this case. This case was decided by the IJ purely on adverse credibility findings. From the very beginning, six questions into the direct examination. After his attorney asked simple questions like where were you born, etc., the judge jumped in and proceeded to grill him on why he didn't know his exact birthday. And she ended by asking a bunch of confusing questions and telling him, are you telling me that for the last ten years you were 18 years old every single year? And he said yes. And then she turned to the, his attorney and said, he can't even give me a straight answer on his exact birthdate. How can I believe anything else he says? Now, in his asylum application, he wrote that. Nevertheless, nevertheless, he did make some materially inconsistent statements about certain aspects of the incident in question. The kind of things that, the kind of discrepancies that are kind of material. I mean, for example, he talked about how his father was knocked out. In one version he says he saw somebody hitting him with a bottle of gun. In another version he says he came in and his father was already knocked out. And then there was the story about how he was knocked out. In one version he was thrown against the wall. And there was another version that was quite different. I mean, those are not discombobulations based on an IJ's, you know, aggressive questioning. Those are kind of things that you expect to remember, remember pretty well. And those are pretty significant differences. This is what you have to deal with. Attacking the IJ is not going to cut very much ice with this. So let me address the first one, which is his description of how his father was attacked, or how the USC militiamen came into the house. And as I conceded in my brief, in his original statement that accompanied his asylum application, someone did help him write, you know, I saw my father being hit by the militiamen. And he testified he didn't see that happen. That's correct. And I want to point out, though, that he testified that pretty much, if you really look at the transcript, when he was asked, you know, what happened when they came in, he said my father was hit. But then pretty much the next sentence he described that he was in the other room and when he came in he saw his father laying on the ground. So what do you get out of that? Because that's different from the declaration. It's different. His explanation, though, later on was that he assumed that his father was hit. That was his explanation. Now, under the BIA's own standard for assessing adverse credibility findings, you first look to see whether the inconsistency existed. And that's number one. And I concede that that did exist. Number two, they look to see whether it was material. Right? That makes sense. And this obviously is material. And then number three, the judge is supposed to consider whether or not there was a reasonable explanation for the discrepancy. And his explanation was that that was wrong. He admitted that he didn't actually see. And he admitted it, I would point out, he admitted it in the direct examination, the first time it was raised. Now you're asking us to exercise power that's not ours. We're a reviewing court on a petition. And here a different conclusion was arrived at by the person on the scene. We don't have the power just to willy-nilly overturn that. There's got to be some material basis for doing that. That's a judgment call and the judgment went the other way. Well, this Court does have the power to look to see whether the BIA considered the explanation for the discrepancy. I still haven't heard the explanation. What was the explanation? The explanation was that statement was wrong. The written statement that someone wrote to him. That's an admission. The statement was wrong. An explanation would be something like saying, well, you know, I didn't write that. Somebody else wrote it and I just signed my name to it because I can't read English. That would be an explanation. It might or might not be believed, but it's an explanation. Or, you know, when I wrote that, I had been drinking or something. I understand. That might not be a very good explanation, but it would be an explanation. Saying that statement was wrong, this one is right, is hardly an explanation. Right. I'm limiting the explanation to what was asked at the time of the immigration court hearing. This is how examination goes. Examination, you know, that's why we have live witnesses. You know, they make a statement. They have to get on the stand and say something. When they say something that's different from what they said before, they have a chance to say, well, I said this before, but here's why the two things are consistent. Or here's an explanation as to why the first time when I said that, you know, you know, it was something about it that somehow tries to reconcile. It didn't happen here. Well, all you said is that one was wrong, this one's right. How do we know that it wasn't the other way around? How do we know that this one isn't wrong, the other one was right? Or maybe both are lies. But there's still the question of whether or not this inconsistency was designed to enhance his – was designed to enhance his – Oh, no, that's not – that's certainly one way in which inconsistency can be material. Another way an inconsistency can be material, if it goes to a material matter, something that's at the heart of his claim. It doesn't have to be something that's better. It may simply show that it's a fabrication because he can't keep the facts straight on something that ought to be fairly central to his claim. If he can't keep straight how his father got knocked out, how he got knocked out, then maybe he's making the whole thing up. The same is true with respect to how he was injured. He told an INS officer, and he admitted this, that he was knocked unconscious when a soldier hit him in the head with a gun. A soldier hit him in the head with a gun. And then his testimony was he was knocked unconscious when a soldier threw him against the wall. Now, again, we're not, you know, privy to that information to be able to make the decision in the first place, but that seems to be kind of a different version of what happened. And this is classic in a courtroom. When people get their details screwed up, you begin to think, gee whiz, maybe they're just winging it. Well, I understand, Your Honor. One thing that's missing about that cross-examination, that question that was raised in the cross-examination about the INS officer, nothing was actually argued or introduced by the government to indicate that he didn't say more than one thing to the asylum officer. So, in other words, his explanation was I was thrown against the wall and I was hit on the head. That was his explanation. What? Where is that explanation? It was in the cross-examination. Did he tell the INS officer he was thrown against the wall? That we don't know. He was never asked that question. And the DHS attorney never raised that question. So, in other words, the DHS attorney never asked him, never said, you only told the INS officer this is the way you were knocked unconscious. Here again, as in the previous case, you have a period of residence in Kenya for three to five years. What is your response to that? He testified in court that he was in a refugee camp, that he lived in a refugee camp the whole time, that he had a food ration coupon, and that he was allowed to go out for short periods of time. So a firm resettlement has not been established. Okay. You want to just have a minute for rebuttal? Yes. Thank you. Okay. Good morning once again. Jan Redfern for the respondent. Your Honor, substantial evidence supports the immigration judge's denial of asylum, withholding, and convention against torture protection because the petitioner failed to present sufficient credible evidence of past persecution or a well-founded fear of future persecution in Somalia. Petitioner's testimony and that of his witness was internally inconsistent and inconsistent with his asylum application and declaration on matters that went to the heart of his asylum claim. There are basically two incidents here. We're talking about the one incident and circumstances of the alleged attack at his home by USC clan members and then his age and identity. With respect to the attack on his family, which is the central and really the only incident of past persecution, it's inconsistent in every detail. First of all, with respect to his injury, he, in his declaration, stated that he was knocked unconscious when one soldier threw him against the wall. In his testimony, he stated they threw him against the wall, and then on cross-examination, he's back to one soldier again. So he's back and forth. Then he's confronted, as was discussed during the petitioner's counsel's argument, with the statement of the INS officer where he said he was knocked out when he was hit in the head with a gun. He tried to reconcile that discrepancy by asserting that two soldiers attacked him. One pushed him against a wall while the other pushed him with a gun. And then when questioned why he had asserted he'd been hit in the head with a gun, he changed the story again, and he claimed that one soldier pushed him against the wall by his head and another hit him with a gun as he was laying on the ground. So these are totally different events from his declaration and his previous testimony on direct examination. His explanation... Hold on a minute. If he was attacked and knocked out like that, you would expect his memory to be less than crystal clear about the event. I mean, these are the kind of events that, thank God, none of us had ever had to go through, and people get all discombobulated when they have a fender bend on the freeway. I can imagine that an event like this would be hard to keep the details exactly straight. Well, it may be, Your Honor, but, again, it is his burden of proof of establishing asylum eligibility, and this is the only incident that he says something about. The government is not claiming firm repatriation in Kenya, right? No, Your Honor. That was not firmly established by the immigration judge, so we are not asserting firm resettlement. Was it tried? I'm sorry? Was it tried? Was it an issue of trial? It was an issue, the fact that he remained in Kenya. Did the government take the position before the IJ that there was firm repatriation? Yes, Your Honor. I believe that it did. And the IJ just didn't make any findings about it? The immigration judge found that firm resettlement may be another reason to not believe the petitioner's account of the events, where he had not fled the country immediately after this incident and remained in refugee camps for nine years. Right, but the question of firm resettlement is different from the question of credibility. Yes, Your Honor. And to have firm resettlement, you have to have certain freedom of movements and the like. Correct. And the IJ didn't make any findings on that? That's correct, Your Honor. The basis of the IJ's decision is solely based on adverse credibility. So if the court disagrees with that, it would have to remand to the board for further proceedings with the immigration judge to establish the firm resettlement or the events in question, the merits of the asylum claim. Back to your question about maybe he was confused, I think he did testify. His explanation wasn't the statement was wrong, as Petitioner's counsel stated. He stated, I was confused, confused at the time of the events, not confused later when he was recounting the events, not confused between the time he wrote his declaration and the time he testified about the events. He said he was confused at the time the events occurred, which doesn't explain why he has different varying accounts of the same incident in his declaration and in his testimony. With respect to the attacks on his father and his sister, his declaration stated that, I saw, clearly, I saw a soldier with his rifle hit my father on the head, and then he described his father falling to the ground. But he testified he was in the other room at the time, and he assumed, because he heard a thump, I believe, were his words, that he assumed his father was hit in the head with a rifle and fell to the ground. He concedes this incident. Well, there was a lot going on. I mean, his sister was getting raped in the other room. I mean, it was a stressful time. Well, if you believe the Petitioner, but the immigration judge didn't believe the Petitioner, and neither did the Board of Immigration Appeals, and the Petitioner hasn't shown compelling evidence to this Court why it should have believed the Petitioner, enough compelling evidence to reverse the immigration judge's decision. In his declaration, he implied that he was witness to the rape and murder of his sister. But, again, he testified he wasn't in the room at the time. He just presumed that these events occurred. That's a little weak. You say he implied. He never said, I saw the rape. No, what he did say was, after he saw his father hit the floor, hit in the head with a rifle, his sister was raped and murdered. He testified his sister was in the other room when she was raped and murdered, but he doesn't testify how he knows she was raped and murdered if he was in the other room. He doesn't have a full accounting of his entire claim of persecution. It's probably, if you're in a room next to someplace where somebody's getting raped, he can probably figure it out, I would think. Anything's possible, again, but the Petitioner had the burden of establishing asylum eligibility, and he hasn't presented compelling evidence. When this is his sole claim of persecution, he doesn't provide any corroborating evidence. He doesn't even have information establishing his identity, the fact that he's a Somalian, his age, his date of birth. Nothing to establish that these events occurred. The only thing he has is background evidence on Somalia, which is not in dispute. The government would not dispute the fact that there are dangerous conditions in Somalia for many people. I see. Are you contending that he's Kenyan? No, Your Honor. We're contending we don't know what he is because he lacked credibility. He didn't establish anything. So it's unclear. Where is he being repatriated? The country of repatriation was Somalia, Your Honor, because that's the only thing that we, the Petitioner claimed he was from Somalia, and there's no evidence to the contrary. Not that he established it, but there's no evidence to the contrary. With respect to his witness testimony, the only evidence that he provided that he is Somalian is a witness, Ms. Abdi. And there are inconsistent statements by Ms. Abdi that differ in respect to a Petitioner's claim and with respect to her own declaration. She testified that she's the Petitioner's aunt, but both the Petitioner and his counsel testified that this woman was his cousin. She testified, or in her declaration she stated clearly she was present at the Petitioner's birth, so she knew his birth date. But then she testified, she recanted that and said she was only aware of his birth. She wasn't there. She doesn't know when he was born. She could kind of assume when she was born, but she didn't know. And then lastly, with respect to the last time she saw the Petitioner in her declaration, she stated she last saw him in 1991. They were together before they fled the Civil War in 1991. Yet she testified that she last saw him in 1990 because she left Somalia in 1990. With all the evidence, Your Honor, the Petitioner has failed to establish asylum eligibility with credible, persuasive evidence, and his failure to corroborate his claim is fatal to his claim. Nothing in the record compels a conclusion contrary to the one the Immigration and the Board reached. And for these reasons, the Petitioner's claim should be denied. Thank you. With regard to which country, his age and identity, I also point out that a Somali translator was used. So the issue of what country he's from, clearly he's from Somalia. With regard to the declaration, the statement that he submitted with his asylum application, I simply point out that the events that we're talking about occurred when he was about 10 years old, when he was very young. When he first came into the country and applied for asylum, his English was very poor. Now, even though the statement itself doesn't – I didn't prepare that statement. It didn't go through as it probably should to have a translator certify that the statements were translated to him and signed. It was a standard on pleading paper declaration that an attorney or someone like that apparently prepared, and he simply signed it. So I would, again, just simply stress that in this instance, if there's any incentive to bolster a statement or any statements, it would be done during the direct, and then he would get caught lying in the cross. In this case, all his statements in his direct were correct.  Thank you.
judges: Kozinski, Trott, Sand